## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STEVEN CARTER, | ) | 3:20-CV-1616 (SVN) |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TD BANK, N.A., | ) | |
| *Defendant*. | ) | June 5, 2023 |

## RULING AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Sarala V. Nagala, United States District Judge.

In this employment discrimination action, Plaintiff Steven Carter alleges that his former employer, Defendant TD Bank, N.A., terminated him due to his gender, his disability, and his request to take paternity leave. Specifically, Plaintiff alleges that Defendant discriminated and retaliated against him due to his gender in violation of Title VII, 42 U.S.C. § 2000e-2; due to his disability in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*; and due to his request to take paternity leave in violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2612 *et seq.* Defendant contends that it was instead Plaintiff's fraudulent activity with a customer's account that motivated his termination—not his gender, disability, or request to take paternity leave. Defendant now seeks summary judgment in its favor. For the reasons described below, Defendant's motion for summary judgment is GRANTED.

## I.    FACTUAL BACKGROUND & PROCEDURAL HISTORY

The following facts are undisputed except when noted.[1] Defendant is a national bank with various retail stores throughout the United States, including one in New Canaan, Connecticut. Pl.'s Local Rule ("L.R.") 56(a)2 Statement ("St."), ECF No. 45-2, ¶¶ 1–3. Plaintiff was hired as the

---

[1] The Court notes that Plaintiff's recitation of facts in his briefing, which is organized by source of information rather than in chronological or topical fashion, is difficult to follow.

Store Manager of the New Canaan store on August 6, 2018.  *Id.* ¶¶ 4–5.  As Store Manager, Plaintiff reported to Kevin Taylor, the Retail Market Manager, who interviewed Plaintiff and participated in the decision to hire him.  *Id.* ¶ 7; Taylor Dep., ECF No. 41-4, at 8:1–2.

Plaintiff believes he has suffered from anxiety since before he started working for Defendant.  Pl.'s L.R. 56(a)2 St. ¶¶ 25–26.  He testified that he did not believe his anxiety affected his performance as Store Manager and that he never requested time off related to his anxiety.  Pl.'s Dep., ECF No. 41-3, at 190:2–8; Pl.'s L.R. 56(a)2 St. ¶¶ 26, 28.

A.  Defendant's Leave Policies

Relevant here, Defendant has a Paid Time Off ("PTO") program, an FMLA Policy, and a Paid Parental Leave Policy, each of which is set forth in its Employee Handbook.  Pl.'s L.R. 56(a)2 St. ¶¶ 9–10; ECF No. 41-8.  The PTO program affords employees time off for "vacation, sick, personal, and holiday time," based on hours the employee accrues over the course of their employment.  ECF No. 41-8 at 11.  PTO is generally scheduled with and approved by the employee's manager.  *Id.* at 14.

The FMLA Policy, consistent with federal law, permits employees to take up to twelve weeks of unpaid leave per year due to the birth of a child, among other reasons.  *Id.* at 20.  That Policy requires the employee to contact Defendant's Leave Administrator at least thirty days prior to the anticipated start of the leave, and the Leave Administrator will inform the employee whether they are eligible for the leave.  *Id.* at 23.  Defendant's third-party Leave Administrator is The Hartford.  DiCicco Dep., ECF No. 41-5, at 21:24–22:1.

The Paid Parental Leave Policy permits eligible employees to take up to sixteen weeks of paid leave due to the birth of a child, to run concurrently with any FMLA leave.  ECF No. 41-8 at 29–30.  That Policy requires the employee to (1) provide written notice by email to the employee's

manager regarding the expected start and duration of the leave, *and* (2) contact Defendant's Leave Administrator to initiate a formal leave request. *Id.* at 29, 31.

### B.  Plaintiff's Plans Regarding the Anticipated Birth of His Child

In July of 2019, Plaintiff orally informed Taylor that his wife was pregnant and he intended to take leave at the time of his child's birth, to which Taylor responded, "ok, that's great."  Pl.'s L.R. 56(a)2 St. ¶ 15; Pl.'s Dep., ECF No. 41-3, at 9.  Plaintiff testified that, nonetheless, "from that moment on," Taylor's "tone and demeanor" toward him "changed dramatically."  Pl.'s Dep., ECF No. 41-3, at 54:16–24.

The following facts do not appear in Plaintiff's Local Rule statement, but are drawn from his deposition.[2]  Plaintiff was considering seeking to transfer to a store closer to his home following the birth of his child.  Pl.'s Dep., ECF No. 45-4, at 41:18–23.  Around August of 2019, he sent an email to another retail market manager in New York, closer to where he lived, asking her to inform him if a store manager position in New York became available.  *Id.*  That manager forwarded the email to Taylor, who then called Plaintiff and "went off" on him, called him "immature," and said he was "acting like a child."  *Id.* at 42:2–8.  Immediately thereafter, Plaintiff had an anxiety attack that his medication was not effective in treating.  *Id.* at 42:8–9, 13–14.  Although he spoke with an unidentified employee in Human Resources who assured him that they would put him in touch with a therapist soon, he never received further communication about this incident.  *Id.* at 42:9– 43:11.  Plaintiff emailed Taylor to let him know that he was having the severe anxiety attack.  *Id.*

---

[2] The Court admonishes Plaintiff's counsel for failing to include these and other important facts in his Local Rule Statement of Additional Material Facts.  *See* D. Conn. L. Civ. R. 56(a)2(ii).  The Court has no obligation "to perform an independent review of the record to find proof of a factual dispute."  *Amnesty Am. v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002).  *See also Swinton v. Wright*, 776 F. App'x 721, 723 (2d Cir. 2019) (summary order) (affirming a district court's grant of summary judgment notwithstanding evidence in the record the plaintiff never brought to the court's attention); *Tracey v. Dep't of Soc. Servs.*, No. 3:17-cv-745 (KAD), 2019 WL 2526299, at *2 (D. Conn. June 19, 2019) (admonishing a plaintiff for attaching documents and transcripts without directing the court to specific citations in the record).  Nonetheless, the Court will consider Plaintiff's deposition testimony for purposes of this ruling.

at 43:4–9.  Although Plaintiff expected "support" from Taylor following this email, Taylor never mentioned Plaintiff's anxiety or asked if he needed time off, though Taylor also never made any negative comments about Plaintiff's anxiety.  *Id.* at 193:2–19.

Plaintiff's wife was later scheduled for a birth by Cesarean section ("C-section") to take place on January 30, 2020.  Pl.'s L.R. 56(a)2 St. ¶ 16.  On September 30, 2019, Plaintiff sent an email to Neil Gray, an administrative assistant employed by Defendant, regarding leave for the birth of his child.  ECF No. 41-11 at 1.  The email represented that Plaintiff had spoken to "Kevin" (presumably Kevin Taylor) about Plaintiff's intention to take a period of "PTO" for the birth of his child from January 30, 2020, through February 14, 2020.  *Id.*  Then, on October 14, 2019, Plaintiff sent another email to Gray amending his request such that he would take January 23, 2020, through January 29, 2020, as PTO, and then start parental leave on January 30, 2020, the day of the scheduled C-section.  *Id.* at 2.  Later that day, Gray responded, notifying Plaintiff that his PTO and paternity leave requests had been approved.  *Id.* at 3.  *See also* Pl.'s L.R. 56(a)2 St. ¶¶ 19–20.  Plaintiff testified that he never communicated directly with Taylor about the particulars of his leave, in light of his email exchanges with Gray.  Pl.'s Dep., ECF No. 41-3, at 147:5–9.  Taylor likewise testified that he and Plaintiff did not have a conversation about his parental leave.  Taylor Dep., ECF No. 41-4, at 40:12–13.

Plaintiff admits that no one employed by Defendant made any negative comment about Plaintiff taking leave for the birth of his child.  Pl.'s L.R. 56(a)2 St. ¶¶ 21–22.  Plaintiff also admits that other male employees who reported to Taylor were granted parental leave without incident.  *Id.* ¶ 24.

C. <u>Complaints and Communications with Human Resources</u>

The following facts also do not appear in Plaintiff's Local Rule 56(a)2 Statement.  Around mid-October of 2019, Plaintiff called Diane DiCicco, Defendant's Human Resources employee, to complain about Taylor.  Pl.'s Dep., ECF No. 45-4, at 19:8–9, 23:10–11; DiCicco Dep., ECF No. 45-6, at 24:4–9.  Plaintiff testified that he complained of harassment, discrimination, and a hostile work environment beginning when he informed Taylor that he would be taking parental leave, and that DiCicco did not take his complaint seriously and suggested that the issues he described were simply miscommunications.  Pl.'s Dep., ECF No. 45-4, at 19:8–17.  DiCicco, however, testified that Plaintiff complained that Taylor was "asking him a lot of questions" regarding hours worked and business development efforts, and that he did not mention discrimination or his request for parental leave.  DiCicco Dep., ECF No. 45-6, at 26:9–22.

Plaintiff testified that, even though he told DiCicco that he was not comfortable bringing the issues to Taylor's manager, Lisa Holland, DiCicco communicated information about the complaint to Holland anyway.  Pl.'s Dep., ECF No. 45-4, at 19:21–20:17; *see also* DiCicco Dep., ECF No. 45-6, at 27:12–18, 29:5–6.  Plaintiff further testified that Holland contacted him and, like DiCicco, she did not take his complaint seriously.  Pl.'s Dep., ECF No. 45-4, at 20:11–21:3.

DiCicco testified that, after her conversation with Plaintiff, she spoke about his concerns with Taylor, who reported some concerns with Plaintiff's working hours and business development efforts.  DiCicco Dep., ECF No. 45-6, at 29:9–21; *see also* Taylor Dep., ECF No. 45-7, at 49:9–15.  DiCicco represented that they discussed clarifying Taylor's expectations of Plaintiff going forward, but not formal discipline.  DiCicco Dep., ECF No. 45-6, at 29:21–30:1.

D. <u>Ethics Investigation and Plaintiff's Termination</u>

In July of 2019, Plaintiff's brother, Brian Carter ("Carter"), who resided in Florida at that time, opened business accounts with Defendant for his company, Ares Security and Investigation, LLC. Pl.'s L.R. 56(a)2 St. ¶ 31; B. Carter Dep., ECF No. 41-6, at 8:13. Plaintiff helped Carter open those accounts, which meant that the New Canaan store, where Plaintiff worked, "got credit" for the opening of those accounts. Pl.'s Dep., ECF No. 41-3, at 224:10–21, 231:11–18; *see also* ECF No. 41-9. Plaintiff represents that the financial benefit associated with opening Carter's accounts was minimal. Pl.'s Aff., ECF No. 45-8, ¶¶ 16–17.

Plaintiff testified at his deposition that, in the beginning of November of 2019, he received a report that Carter's accounts had been closed because they had not been funded in the required time period. Pl.'s Dep., ECF No. 41-3, at 231:8–10, 21–23. The closing of the accounts had a negative impact on the New Canaan store in the form of a claw back of the credit the store had received when the accounts were opened. *Id.* at 234:7–18. When Plaintiff he received the report, he contacted Carter, who informed Plaintiff that he forgot to fund the accounts and wanted to reopen them. *Id.* at 233:14–23. Carter was visiting Plaintiff that week to attend his wife's baby shower, so Plaintiff told Carter that they would reopen the accounts while Carter was visiting. *Id.* at 141:12–21, 233:20–23. Plaintiff testified that Carter visited him from November 5, 2019, until November 8, 2019. *Id.* at 141:18–21, 238:14–16.

Around that time, on November 6, 2019, Taylor sent Plaintiff an email asking to schedule a phone call about preventive steps to reduce future claw backs. ECF No. 41-10 at 3. Plaintiff promptly responded, "Sure thing." *Id.* at 2. About an hour later, Plaintiff sent another email to Taylor explaining that he had spoken to "the customer," that the customer's accounts had been mistakenly left unfunded, and that the customer asked Plaintiff to reopen them and transfer money

into them. *Id.* at 3. Plaintiff testified in his deposition that the "customer" referenced in this email was Carter. Pl.'s Dep., ECF No. 41-3, at 237:9. Later that same day, Plaintiff opened three new accounts for Carter's business to replace the three accounts that had been closed. *Id.* at 238:8–11; ECF No. 41-7 at 17.

On November 11, 2019, Carter went to Defendant's store in St. Augustine, Florida, because his mobile banking app indicated that he had several accounts, each containing $100, and he believed this "must be wrong." B. Carter Dep., ECF No. 45-5, at 31:5–17. According to an investigation report prepared by Defendant that is discussed further below, two of Defendant's employees in the St. Augustine store told Carter that the accounts had been opened and funded in Connecticut on November 6, 2019, and Carter told them that it was "fraud" because he did not know anyone who lived in Connecticut and he had not put the money into the accounts. *Id.* at 32:9–14. Carter said he had been in Delaware, not Connecticut, when the accounts were opened and funded. ECF No. 41-7 at 6. Carter confirmed that he did not sign the account documents, that he did not authorize the transfer of funds, and that he did not want to keep the accounts open. *Id.* One of Defendant's employees in the St. Augustine store closed the accounts at Carter's request and reported her concerns of possible fraud to the Northeast Regional Operations Officer ("ROO"). *Id.* at 3; DiCicco Dep., ECF No. 41-5, at 35:10–19; Pl.'s L.R. 56(a)2 St. ¶ 35.

The ROO then brought the issue to Taylor's attention, given that it concerned the conduct of Plaintiff, one of Taylor's store managers. Pl.'s L.R. 56(a)2 St. ¶ 36; Taylor Dep., ECF No. 41-4, at 34:1–11. Taylor then reported the possible fraud to Human Resources, which triggered an Integrity Review Investigation, conducted by Nancy Pelikan. Pl.'s L.R. 56(a)2 St. ¶ 37; DiCicco

Dep., ECF No. 41-5, at 35:12–19; ECF No. 41-7 at 1.  Pelikan issued a report on November 22, 2019, in which she recommended terminating Plaintiff's employment.[3]  ECF No. 41-7 at 7.

Specifically, Pelikan interviewed the two employees at the St. Augustine store and found both employees credible.  *Id.* at 6.  She also interviewed Plaintiff, who she found not credible, particularly with respect to Plaintiff's representation that Carter forgot he had authorized the new accounts and the transfer of funds mere days before reporting the fraudulent activity to the employees at the store in St. Augustine.  *Id.* at 4–6.  Pelikan noted that Plaintiff supplied several different dates for the baby shower he claimed Carter was attending at his home when the new accounts were opened.  *Id.* at 4.  Pelikan also observed that Carter's signatures on the documents authorizing the opening of the new accounts appeared different from the signatures on the documents authorizing the opening of the original accounts, and different from the updated signature obtained from Carter when he went to the St. Augustine store on November 11, 2019. *Id.*  Finally, Pelikan recounted that, on November 19, 2019, the day she interviewed Plaintiff and told him not to share confidential information or interfere in the investigation, Plaintiff then spoke with Carter, who went back to the St. Augustine store later that same day and asked one of the employees he had spoken to before "what was happening" with the accounts at issue and if the employee "did anything else." *Id.* at 6.  The employee responded that the accounts remained closed per Carter's request during his earlier visit to the store.  *Id.*  Pelikan reasoned that Plaintiff violated Defendant's policies by having Carter speak with the employees at the St. Augustine store "in an attempt to gain information." *Id.*

---

[3] Plaintiff attests that Pelikan's original investigative report concerned purportedly fraudulent annuities, but that Carter had no annuities.  Pl.'s Aff., ECF No. 45-8, ¶¶ 6–7.  The only investigative report provided to the Court, however, makes no mention of annuities.  *See generally* ECF No. 41-7.

Pelikan concluded that it was plausible that Plaintiff forged Carter's signature on the documents authorizing the opening of the new accounts and thus recommended terminating his employment.  *Id.* at 6–7.  For his part, Plaintiff maintains that he never signed Carter's name to any document, and that he never copied and pasted Carter's signature onto any document.  Pl.'s Dep., ECF No. 45-4, at 261:3–12.  Plaintiff also maintains that Pelikan "fabricated several facts," and that she "forbid [Plaintiff] from collecting evidence from [his] brother" relating to the investigation.  *Id.* at 24:17–25:17.

Pelikan communicated her recommendation to Taylor and Holland.  Taylor Dep., ECF No. 41-4, at 32:3–10.  Although Taylor could not recall what, if anything, he or Holland said in response to Pelikan's recommendation, they ultimately implemented her recommendation.  *Id.* at 32:11–15.  Plaintiff was terminated on December 3, 2019.  Pl.'s L.R. 56(a)2 St. ¶ 29.  Plaintiff testified that Taylor told him he was terminated for violating Defendant's ethics policy, but that, when asked, Taylor would not go into details.  Pl.'s Dep., ECF No. 45-4, at 16:16–17:8.  Taylor participated in hiring Plaintiff's replacement, Erica Lopez.  Taylor Dep., ECF No. 45-7, at 42:11–15.

E.  Procedural History

Following an administrative release of jurisdiction, Plaintiff initiated the present action, claiming that Defendant violated Title VII, the ADA, and the FMLA by terminating him due to his gender, his disability, and his request for parental leave, and by retaliating against him for asserting his rights under those statutes.  Compl., ECF No. 1, ¶¶ 114–49.  Specifically, Plaintiff alleged:  gender discrimination in violation of Title VII, *id.* ¶ 114 (Count One); retaliation for reporting gender discrimination in violation of Title VII, *id.* ¶ 121 (Count Two); retaliation for requesting to take a leave under the FMLA, *id.* ¶ 127 (Count Three); interference with the exercise

of his rights under the FMLA, *id.* ¶ 134 (Count Four); disability discrimination in violation of the ADA, *id.* ¶ 137 (Count Five); and retaliation for reporting disability discrimination in violation of the ADA, *id.* ¶ 144 (Count Six). Following the close of discovery, Defendant filed the present motion seeking summary judgment in its favor on all counts. When responding to Defendant's motion, Plaintiff abandoned his claims of FMLA interference (Count Four) and ADA retaliation (Count Six).

## II.     LEGAL STANDARD

### A.   Federal Rule of Civil Procedure 56

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that a court "shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." A disputed fact is material only where the determination of the fact might affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). With respect to genuineness, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing there is no genuine issue of material fact in dispute will be satisfied if the movant can point to an absence of evidence to support an essential element of the non-moving party's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears an initial burden of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. A movant, however, "need not prove a negative

when it moves for summary judgment on an issue that the [non-movant] must prove at trial.  It

need only point to an absence of proof on [the non-movant's] part, and, at that point, [the non-

movant] must 'designate specific facts showing that there is a genuine issue for trial.'"  *Parker v.*

*Sony Pictures Ent., Inc.*, 260 F.3d 100, 111 (2d Cir. 2001) (quoting *Celotex Corp.*, 477 U.S. at

324).  The non-moving party, in order to defeat summary judgment, must come forward with

evidence that would be sufficient to support a jury verdict in his or her favor.  *Anderson*, 477 U.S.

at 249.  If the non-movant fails "to make a sufficient showing on an essential element of [their]

case with respect to which [they have] the burden of proof," then the movant will be entitled to

judgment as a matter of law.  *Celotex Corp.*, 477 U.S. at 323.

In considering a motion for summary judgment, a court "must construe the facts in the light

most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable

inferences against the movant."  *Kee v. City of New York*, 12 F.4th 150, 158 (2d Cir. 2021) (citation

and internal quotation marks omitted).  "[O]nly when reasonable minds could not differ as to the

import of the evidence is summary judgment proper."  *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d

Cir. 1991).

B.  *McDonnell Douglas* Framework

All of Plaintiff's remaining claims are analyzed under the burden-shifting framework set

forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), with some variations with

respect to particular claims, as explained below.  *See Weinstock v. Columbia Univ.*, 224 F.3d 33,

42 (2d Cir. 2000) (Title VII gender discrimination claim); *Chen v. City Univ. of N.Y.*, 805 F.3d 59,

70 (2d Cir. 2015) (Title VII retaliation claim); *Natofsky v. City of New York*, 921 F.3d 337, 348

(2d Cir. 2019) (ADA disability discrimination claim); *Graziadio v. Culinary Inst. of Am.*, 817 F.3d

415, 429 (2d Cir. 2016) (FMLA retaliation claim).  Although the *McDonnell Douglas* framework

effectively shifts the "intermediate evidentiary burdens" between the plaintiff and defendant, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff," or that the defendant intentionally retaliated against the plaintiff, "remains at all times with the plaintiff." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (cleaned up; quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1993)).

Under the *McDonnell Douglas* burden-shifting framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination or retaliation. *Burdine*, 450 U.S. at 252–53. The particular elements of the plaintiff's *prima facie* case vary depending on the substantive claim, and the plaintiff's burden at this step is *de minimis*. *Id.* at 253 (noting that the plaintiff's burden of satisfying a *prima facie* case is "not onerous"); *Weinstock*, 224 F.3d at 42. If the plaintiff satisfies his *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory or non-retaliatory reason for the challenged employment action. *Burdine*, 450 U.S. at 254; *Weinstock*, 224 F.3d at 42; *Chen*, 805 F.3d at 70; *Graziadio*, 817 F.3d at 429.

If the defendant articulates a legitimate, non-discriminatory or non-retaliatory reason for its action, the burden shifts back to the plaintiff to show that the proffered reason is "not the true reason" or is otherwise pretextual. *Burdine*, 450 U.S. at 256; *Kwan v. Andalex Grp., LLC*, 737 F.3d 834, 845 (2d Cir. 2013).

The final step of the *McDonnell Douglas* framework requires the court to examine the entire record—including evidence from the plaintiff's *prima facie* case, additional evidence suggesting pretext, and other evidence of the defendant's discriminatory or retaliatory intent—and to "determine whether the plaintiff could satisfy his ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against him" or retaliated against him. *Schnabel v.*

*Abramson*, 232 F.3d 83, 90 (2d Cir. 2000) (internal quotation marks omitted); *see also Burdine*, 450 U.S. at 256 (explaining that the plaintiff's third-step burden to demonstrate pretext "merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination"). "Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors," including the "strength of the plaintiff's *prima facie* case," the "probative value of the proof that the employer's explanation is false," and any other properly considered evidence that supports the employer's case. *Reeves*, 530 U.S. at 148–49 (italicization added).

The Court discusses the application of the *McDonnell Douglas* standard to Plaintiff's various claims below.

### III.   TITLE VII

#### A.   Discrimination in Violation of Title VII (Count One)

##### 1.   Legal Standard

Title VII prohibits an employer from terminating an employee due to the employee's gender, among other protected characteristics. 42 U.S.C. § 2000e-2(a)(1). Under the *McDonnell Douglas* framework, a plaintiff must establish a *prima facie* case of discrimination by showing that: (1) he is a member of a protected class; (2) he was qualified for the position at issue; (3) he suffered an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination. *Weinstock*, 224 F.3d at 42. If the plaintiff establishes a *prima facie* case, and if the defendant then proffers a legitimate, non-discriminatory reason for the adverse employment action, the burden shifts back to the plaintiff to show that the proffered reason was "unworthy of credence" or not the only reason. *Burdine*, 450 U.S. at 256; *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995). Such a showing may be made by

demonstrating "weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate" reason for its action because, "[f]rom such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Kwan*, 737 F.3d 834. The plaintiff's ultimate burden is to show that "the prohibited factor was at least one of the 'motivating' factors." *Cronin*, 46 F.3d at 203; *see also Menaker v. Hofstra Univ.*, 935 F.3d 20, 38 (2d Cir. 2019) (considering a gender discrimination claim and explaining that the ultimate question is whether the plaintiff's gender was a motivating factor).

### 2. Discussion

#### a. Plaintiff's *Prima Facie* Case

For the purpose of summary judgment, Defendant does not dispute that Plaintiff has satisfied the first three elements of his *prima facie* case of gender discrimination. Specifically, Defendant concedes that Plaintiff is a member of a protected class due to his gender, that he was qualified for his position, and that he suffered an adverse employment action when Defendant terminated him. Defendant contends, however, that Plaintiff fails to raise a genuine dispute of material fact on the question of whether his termination occurred under circumstances giving rise to an inference of gender discrimination. Defendant devotes little argument to Plaintiff's *prima facie* burden, however, and instead primarily relies on the strength of its legitimate, non-discriminatory reason at the next step of the *McDonnell Douglas* analysis.

The Court concludes that Plaintiff has established his *prima facie* case of gender discrimination, because he was replaced by a woman.[4] Evidence that an employer replaced a terminated employee with an individual outside the employee's protected class gives rise to an

---

[4] The Court again notes that Plaintiff has not mentioned this fact in his Local Rule 56(a)2 Statement. *See supra* footnote 2. Nonetheless, because Taylor testified that a female was hired for Plaintiff's position after his termination, *see* Taylor Dep., ECF No. 45-7, at 42:14–16, the Court considers this information.

inference of discrimination. *Littlejohn v. City of New York*, 795 F.3d 297, 312–13 (2d Cir. 2015); *see also Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1239 (2d Cir. 1995) (explaining that a plaintiff alleging gender discrimination can satisfy his *prima facie* case by showing that the employer hired a person of a different gender to replace him). Here, Taylor testified that Plaintiff was replaced by Erica Lopez, a woman who was outside Plaintiff's protected class. Taylor Dep., ECF No. 45-7, at 42:15. By pointing to that testimony, Plaintiff has satisfied his minimal burden to identify circumstances giving rise to an inference of discrimination. *See Maynard v. Stonington Cmty. Ctr.*, No. 3:15-CV-483 (RNC), 2018 WL 1633709, at *5 (D. Conn. Mar. 31, 2018) (finding an inference of discrimination when the plaintiff was replaced by a person of a different gender).

### b.   Defendant's Legitimate, Non-Discriminatory Reason

At step two, Defendant has satisfied its burden to proffer a legitimate, non-discriminatory reason for terminating Plaintiff. Specifically, Defendant points to Pelikan's investigative report, which found it plausible that, in November of 2019, Plaintiff forged Carter's signatures when opening new accounts for Carter's business in response to the closure of the prior accounts. Because Defendant's burden at this step of the *McDonnell Douglas* analysis is "one of production, not persuasion," *Reeves*, 530 U.S. at 142, Defendant has satisfied its burden by simply specifying a non-discriminatory reason for terminating Plaintiff.

### c.   Evidence of Pretext/Gender as a Motivating Factor

At the final step, the Court concludes that Plaintiff has failed to raise a genuine dispute of material fact concerning whether Defendant's proffered reason was a pretext for gender discrimination or whether gender was in fact a motivating factor behind its decision to terminate Plaintiff. *See Menaker*, 935 F.3d at 38.

Under Supreme Court precedent, a plaintiff's *prima facie* case, "combined with sufficient evidence to find that the employer's asserted justification is false" *may* be sufficient to withstand summary judgment under the *McDonnell Douglas* framework. *Reeves*, 530 U.S. at 148; *see James v. N.Y. Racing Ass'n*, 233 F.3d 149, 156–57 (2d Cir. 2000) (stating that "evidence satisfying the minimal *McDonnell Douglas prima facie* case, coupled with evidence of falsity of the employer's explanation, may or may not be sufficient to sustain a finding of discrimination" (italicization added)). This is because proof that the defendant's explanation is "unworthy of credence" is often persuasive circumstantial evidence of intentional discrimination. *Reeves*, 530 U.S. at 147. Nonetheless, a defendant may occasionally be entitled to summary judgment even under these circumstances, as the Court's task is to "examine the entire record" and "make the case-specific assessment as to whether a finding of discrimination may reasonably be made." *Zimmermann v. Assocs. First Cap. Corp.*, 251 F.3d 376, 382 (2d Cir. 2001).[5]

Here, the Court first notes that Plaintiff's protestations that he did nothing wrong, and that both the conclusion and process of Defendant's ethics investigation were flawed, are not sufficient to withstand summary judgment. A discrimination claim turns on "what *motivated* the employer." *McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006) (citation and internal quotation marks omitted; emphasis in original). If the circumstances demonstrate either that the employer knew the proffered reason was false or that the reason is so unworthy of credence that the employer could not have believed its truth in good faith, such evidence can be probative of an employer's discriminatory state of mind. *See Reeves*, 530 U.S. at 147; *Kwan*, 737 F.3d at 846. But neither situation is present here.

---

[5] For example, "an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Reeves*, 530 U.S. at 148.

The record establishes that Pelikan, and, in turn, Defendant, had a good faith basis to believe that Plaintiff committed forgery.  *See Maynard*, 2018 WL 1633709, at *6 (granting summary judgment to an employer who made "a good faith determination that [the] plaintiff engaged in the misconduct underlying the four reasons given for her discharge").  Two employees from the St. Augustine store reported to Pelikan that Carter was "adamant" that he did not sign any paperwork, that he did not authorize the opening of the accounts or the transfer of funds, and that he did not want to keep the accounts open.  ECF No. 41-7 at 6.  Pelikan observed that, contrary to Plaintiff's representation that Carter was visiting him in New York at the time the accounts were opened five days prior, Carter informed the St. Augustine store employees that he had been in Delaware at the time.  *Id.*  Plaintiff provided Pelikan with several inconsistent dates for the baby shower he claimed Carter was attending when the new accounts were opened.  *Id.* at 4.  Moreover, Pelikan observed that the signatures on the paperwork authorizing the opening of the accounts at issue looked different than the signatures on the paperwork authorizing the original accounts and the signature Carter provided to the St. Augustine store employees.  *Id.*  Based on all of this information, Pelikan did not credit Plaintiff's representation that Carter simply forgot he had authorized the opening of the accounts.  *Id.* at 6.

Plaintiff contends that Defendant did not conduct a true fact-finding investigation and disputes that his opening of accounts for his brother violated company policy.  But, again, the veracity of the misconduct allegations levied against Plaintiff is "immaterial to the question of pretext."  *Vasquez v. N.Y.C. Dep't of Educ.*, 667 F. App'x 326, 327 (2d Cir. 2016) (summary order).  Plaintiff's views, standing alone, do not demonstrate that Defendant's reason for firing Plaintiff was so riddled with weaknesses, inconsistencies, implausibilities, or contradictions that a reasonable juror could conclude the reason was a pretext for gender discrimination.  For instance,

Plaintiff has produced no evidence to support his assertion that Defendant's accusations of misconduct changed over time.  Based on the record before the Court, Defendant's proffered legitimate, non-discriminatory reason for termination—the ethics violation—is not so weak or implausible that a reasonable jury could conclude that the true reason, instead, was gender discrimination.  *See Caruso v. Bon Secours Charity Health Sys. Inc.*, No. 14 CV 4447 (VB), 2016 WL 8711396, at \*10 (S.D.N.Y. Aug. 5, 2016) ("To defeat summary judgment, plaintiff must produce some evidence—not mere speculation—undermining the [defendants'] assertion that they reasonably believed [the] plaintiff had violated [employment] policies, or some evidence of pretext revealing discriminatory intent."), *aff'd*, 703 F. App'x 31 (2d Cir. 2017) (summary order).

In addition, the Court is unpersuaded by Plaintiff's contention that his evidence regarding the favorable treatment of two similarly situated employees creates genuine disputes of material fact to survive summary judgment on his gender discrimination claim.  A plaintiff may present evidence of discrimination by showing that "similarly situated employees of a different [class] were treated more favorably."  *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999) (Sotomayor, J.); *accord Bjorklund v. Golub Corp.*, No. 3:18-CV-1271 (MPS), 2020 WL 902602, at \*5 (D. Conn. Feb. 25, 2020) (quoting *Adamczyk v. N.Y. Dep't of Corr. Servs.*, 474 F. App'x 23, 27 (2d Cir. 2012) (summary order)), *aff'd*, 832 F. App'x 97 (2d Cir. 2021) (summary order).  To make such a showing, the employees to whom the plaintiff seeks to compare himself must be "similarly situated in all material respects," *Norville*, 196 F.3d at 95 (citation and internal quotation marks omitted).

Specifically, in this context, Plaintiff needs to show that he and the comparator (1) were subject to the same workplace standards, and (2) committed misconduct of comparable seriousness.  *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000); *see also Bjorklund*,

2020 WL 902602, at *5.  Relevant to the second requirement, "the standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical."  *Graham*, 230 F.3d at 40.  Whether a comparator and the plaintiff are similarly situated is generally "a factual issue that should be submitted to the jury," but that rule is "not absolute"; rather, "a court can properly grant summary judgment where it is clear that no reasonable jury could find" the comparator and the plaintiff to be similarly situated.  *Fahrenkrug v. Verizon Servs. Corp.*, 652 F. App'x 54, 56–57 (2d Cir. 2016) (summary order) (quoting *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir. 2001)); *accord Woods v. Newburgh Enlarged City Sch. Dist.*, 288 F. App'x 757, 760 (2d Cir. 2008) (summary order).  Here, Plaintiff, through only his own deposition testimony and affidavit, identifies two female employees who he contends committed similar misconduct and were not terminated for that misconduct:  a female branch manager and a female teller.  Neither comparator is similarly situated to Plaintiff, however.

First, Plaintiff testified to the following facts concerning the actions of a female branch manager.  Towards the "latter part" of Plaintiff's employment, there was a meeting attended by various store managers at which a representative of Defendant showed attendees, including Plaintiff, paperwork for the opening of an account that contained "red flags" and "errors" that "should have been caught as fraudulent."  Pl.'s Dep., ECF No. 45-4, at 68:3–4, 362:18–363:2.  In addition, the prospective account holder "was a physical business," so an employee was supposed to "go and verify that the business existed," but Defendant's representative explained that the female employee authorized the opening of the accounts without verifying that the business existed.  *Id.* at 363:3–6.  Plaintiff testified that that employee "signed off on" the paperwork without catching fraudulent information contain in the paperwork, resulting in "fraudulent

accounts being opened," "serious violations" of Defendant's policies, and the loss of "tens of thousands of dollars in fraud." *Id.* at 68:7–12; 363:2–5. Plaintiff further testified that, when Defendant's representative showed the meeting attendees the paperwork, the name of the branch where the accounts were opened and the name of the store manager who had improperly authorized the opening of the accounts had been redacted. *Id.* at 68:14–15. But the store manager, a woman, was present, and "she stood up and acknowledged that it was her branch" and it was she who had committed the policy violations. *Id.* at 68:15–19. Nonetheless, according to Plaintiff, she was not terminated. The female manager had been the store manager of Defendant's Darien branch at the time and reported to Taylor. *Id.* at 68:12, 69:2–4.

While a reasonable jury could find that Plaintiff and this female employee were subject to the same workplace standards, given that they were both store managers who reported to Taylor, *see Polk v. Sherwin-Williams Co.*, 3:16-CV-1491 (MPS), 2019 WL 1403395, at *5 (D. Conn. Mar. 28, 2019) (concluding a reasonable factfinder could infer that store managers are subject to the same evaluation and discipline standards), no reasonable jury could find that Plaintiff and the female manager committed misconduct of a comparable level of seriousness, based on the record before the Court. *See Graham*, 230 F.3d at 40. Plaintiff was accused of *intentionally* forging his brother's signature on account opening paperwork and then opening accounts his brother later reported as fraudulent. Based on Plaintiff's account of the female comparator's misconduct, however, the comparator merely *failed to detect* that the prospective customer had supplied fraudulent information because she did not review the paperwork closely enough and follow Defendant's policy of verifying the existence of the business at the address provided. Although both types of misconduct resulted in the fraudulent accounts having been opened, it is the plaintiff's and comparator's *conduct* that must share a reasonable resemblance, not merely the

shared specter of fraud. *Dotson v. City of Syracuse*, 763 F. App'x 39, 42 (2d Cir. 2019) (summary order) (shedding the "labels" given to the plaintiff's and the comparator's misconduct and looking for similarity in the "underlying facts"). Plaintiff has not explained how intentionally committing fraud and failing to detect another's fraud share a comparable degree of seriousness. *See Adamczyk*, 474 F. App'x at 27 (distinguishing a correctional officer's insubordination from a comparator officer's use of excessive force); *Woods*, 288 F. App'x at 760 (distinguishing a plaintiff's severe violation of a confidentiality policy from the comparators' frequent but less severe violation of that same policy); *Hogan v. State of Conn. Jud. Branch*, 220 F. Supp. 2d 111, 119 (D. Conn. 2002) (distinguishing a plaintiff's physical abuse from a comparator's verbal abuse); *Bjorklund*, 2020 WL 902602, at *6 (distinguishing a plaintiff's violation of a food safety policy from a comparator's conduct in swearing at a customer). Therefore, even accepting Plaintiff's testimony as true and drawing all inferences in his favor, no reasonable jury could conclude that his conduct and that of the female comparator's bear "sufficient resemblance." *See Woods*, 288 F. App'x at 760; *see also Fahrenkrug*, 652 F. App'x at 57 (affirming a district court's conclusion that the plaintiff did not show less favorable treatment than a similarly situated comparator because she did not submit sufficient evidence to raise a genuine dispute of material fact on that issue).

Second, Plaintiff contends that a female head teller he supervised "false proofed" her drawer, which refers to "balancing the cash in the teller drawer without actually counting the money." Pl.'s Aff. ¶¶ 18–19. He attests that this was discovered when her teller's drawer was found to be short by $1,000.00, even though she had reported the drawer as balanced that day. *Id.* ¶ 21. He further attests that, although this is "a severe violation of company policy that results in automatic termination," and although the investigator concluded that the female teller did false

proof her drawer, the teller was not terminated.  *Id.* ¶¶ 20, 22–23.  Plaintiff subsequently discovered the missing money and reported it to the Human Resources staff, who told him that, because the teller had had "no prior incidents and no performance issues," the matter was "being dropped."  *Id.* ¶¶ 24–25.

Based on this account, no reasonable jury could find that Plaintiff and the female teller were similarly situated such that the teller is an appropriate comparator.  Plaintiff does not point to any evidence from which a jury could infer that they were subject to the same workplace standards, or even that their job responsibilities were at all similar.  *See Fahrenkrug*, 652 F. App'x at 57.  Although "employees need not be of the exact same rank to be considered 'similarly situated,'" *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 109 n.7 (2d Cir. 2010), Plaintiff has not raised a genuine dispute of material fact as to whether he and the female teller were in fact subject to the same workplace standards despite that he was her supervisor.  *See Robertson v. Wells Fargo Bank, NA.*, No. 3:14-cv-1861 (VLB), 2017 WL 326317, at *9 (D. Conn. Jan. 23, 2017) (noting that a "supervisor and a subordinate are nearly rarely similarly situated" and finding a bank's service manager not similarly situated to a teller because "the supervisor is charged with assuring the subordinate's adherence to corporate policies" and is "held to different standards"); *Dhir v. Wells Fargo Bank, N.A.*, No. 3:14-cv-1905 (VLB), 2017 WL 830387, at *6 (D. Conn. Mar. 1, 2017) (noting that the plaintiff was the manager of the bank's tellers and that she presented no evidence showing that she "shared the tellers' job duties or responsibilities").[6]

---

[6] Moreover, Plaintiff was also believed to have interfered with Pelikan's investigation into his potentially fraudulent activities by communicating with his brother in contravention of Pelikan's instruction.  Plaintiff has not suggested that either the female store manager or the female teller committed any similar conduct by somehow interfering in the investigations into their misconduct, nor has Plaintiff identified a different comparator with respect to that conduct. *See Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997) (distinguishing the comparators' violations of a "no fraternization" policy from the plaintiff's violation of that same policy because the plaintiff's conduct also involved "harassing behavior and lying").

Accordingly, Plaintiff has not made "a sufficient showing" to create a genuine dispute of material fact on the issue of whether he received less favorable treatment than similarly situated female employees, and summary judgment is appropriate on Plaintiff's gender discrimination claim under Title VII.[7]  *Celotex Corp.*, 477 U.S. at 322.

### B.  Retaliation in Violation of Title VII (Count Two)

#### 1.  Legal Standard

Title VII prohibits an employer from retaliating against an employee because the employee has opposed any practice made unlawful by Title VII.  42 U.S.C. § 2000e-3(a); *Chen*, 805 F.3d at 70.  "The objective of this section is obviously to forbid an employer from retaliating against an employee because of the latter's opposition to an unlawful employment practice."  *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988).  An employee "engages in a protected activity when he protests or opposes an employment practice that he reasonably believes, in good faith, violates the law."  *Joseph v. Marco Polo Network, Inc.*, No. 09 Civ. 1597 (DLC), 2010 WL 4513298, at *17 (S.D.N.Y. Nov. 10, 2010) (citing *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 210 (2d Cir. 2006)).  An employee opposes discrimination by, for example, raising informal complaints of discriminatory employment practices to management.  *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990).

Under the *McDonnell Douglas* framework, a plaintiff must establish a *prima facie* case of retaliation in violation of Title VII by showing:  "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action."  *Hicks v. Baines*,

---

[7] The Court notes that Defendant has not addressed the issue of the alleged female comparators in its reply. Nonetheless, the evidence Plaintiff has offered is insufficient to permit a reasonable jury to infer that Plaintiff was discriminated against on the basis of his gender, even when all inferences are draw in his favor.

593 F.3d 159, 164 (2d Cir. 2010); *accord Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012). If the plaintiff establishes a *prima facie* case, and if the defendant then proffers a legitimate, non-retaliatory reason for the adverse employment action, the burden shifts back to the plaintiff to show that the proffered reason is pretextual. *Kwan*, 737 F.3d at 846. The plaintiff's ultimate burden is to show that retaliation was "a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision." *Id.* (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 349, 360 (2013)). But-for causation "does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Id.*

### 2. Discussion

Although Plaintiff's retaliation theory is not explained clearly in the briefing on the present motion, from his complaint the Court gleans that he is claiming retaliation because he complained to DiCicco that Taylor was harassing him and, as a result, was terminated. *See* Compl., ¶¶ 122–24. In its motion, Defendant challenges only the causation element of Plaintiff's *prima facie* case. The Court concludes that Plaintiff ultimately fails to raise a genuine dispute of material fact regarding the causation element of his *prima facie* case, and summary judgment on this claim is therefore proper.

The Second Circuit has explained that "proof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d. Cir. 2000); *see also Sumner*, 899 F.2d at 209 (same). There is no "bright line to define the outer limits beyond

24

which a temporal relationship is too attenuated to establish a causal relationship" between the protected activity and the adverse action. *Gorman-Bakos v. Cornell Co-Op Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001); *accord Littlejohn*, 795 F.3d at 319. While close temporal proximity between the protected activity and the adverse action may, standing alone, establish the requisite causal connection to demonstrate a *prima facie* case of retaliation, *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010), in such a case, the temporal proximity "must be very close," *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (citations and internal quotation marks omitted). *See also Dollack v. Dep't of Transp.*, No. 3:17-CV-1939 (AVC), 2021 WL 6339060, at *9 (D. Conn. Mar. 25, 2021). Moreover, an "intervening event between the protected activity and the adverse employment action may defeat" the inference of causation created by close temporal proximity. *Joseph*, 2010 WL 4513298, at *18 (collecting cases).

Here, Plaintiff's conversation with DiCicco occurred in mid-October of 2019, approximately six weeks before his termination in early December of 2019. Even assuming, without deciding, that an inference of retaliation could be drawn from the period between Plaintiff's complaint to DiCicco and his termination, the intervening accusation of forgery and investigation of misconduct diminish the probative force of that causal connection. *Joseph*, 2010 WL 4513298, at *18 (finding a ten-day time period insufficient to create an inference of retaliation given that there was evidence of intervening "significant misconduct" by the plaintiff); *see also Gubitosi v. Kapica*, 154 F.3d 30, 33 (2d Cir. 1998) (explaining that a plaintiff failed to prevail on a First Amendment retaliation claim in light of "significant intervening events," involving misconduct by the plaintiff that occurred after she criticized an employment procedure and before her employment was terminated). Given the intervening accusation and investigation of

misconduct, there is not sufficient evidence in the record from which a reasonable jury could find a causal connection between Plaintiff's complaint and his termination.[8]

In sum, the Court concludes that Plaintiff has not demonstrated a causal connection between his complaint to DiCicco and his termination and, thus, he has not satisfied his minimal burden to show a *prima facie* case of retaliation.  Defendant is therefore entitled to summary judgment as to Count Two, Plaintiff's Title VII retaliation claim.

## IV.   DISABILITY DISCRIMINATION (COUNT FIVE)

### A.  Legal Standard

The ADA prohibits discrimination "against a qualified individual on the basis of disability" with respect to, among other things, discharge from employment.  42 U.S.C. § 12112(a).  Under the *McDonnell Douglas* framework, a plaintiff must establish a *prima facie* case of disability discrimination by showing that:  (1) the employer is subject to the ADA; (2) the plaintiff is disabled within the meaning of the ADA; (3) the plaintiff was "otherwise qualified to perform the essential functions of the job with or without reasonable accommodation"; (4) the plaintiff suffered an adverse employment action; and (5) the adverse action "was imposed because of [his] disability." *Davis v. N.Y.C. Dep't of Educ.*, 804 F.3d 231, 235 (2d Cir. 2015) (citing *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 134 (2d Cir. 2008)).  Specifically, a plaintiff must satisfy the final element of his *prima facie* case by showing that the adverse employment action "took place under circumstances giving rise to an inference of discrimination."  *Id.* (quoting *Graham*, 230 F.3d at 39).

---

[8] Plaintiff appears to suggest that the adverse employment action is not his termination, but rather the initiation of the investigation into the suspicion of forgery.  Pl.'s Opp. to Mot. for Summ. J., ECF No. 45-1, at 27 (emphasizing that Taylor initiated the investigation).  But Plaintiff provides virtually no analysis on that point, nor does he cite law for the proposition that a misconduct investigation itself is an adverse employment action as contemplated by Title VII. *See Davis v. Verizon Wireless*, 389 F. Supp. 2d 458, 478 (W.D.N.Y. 2005) (collecting cases for the proposition that "increased scrutiny" does not rise to the level of an adverse employment action); *Nicastro v. Runyon*, 60 F. Supp. 2d 181, 186 (S.D.N.Y. 1999) (same).  Accordingly, the Court need not consider that issue further.

If the plaintiff establishes a *prima facie* case, and if the defendant then proffers a legitimate, nondiscriminatory reason for the adverse employment action, the burden shifts back to the plaintiff to show that the defendant's proffered reason was pretextual. *Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc.*, 198 F.3d 68, 72 (2d Cir. 1999). The plaintiff will ultimately prevail on his ADA discrimination claim only if he proves that his disability was "the but-for cause" of the adverse employment action. *Natofsky*, 921 F.2d at 349.

B. <u>Discussion</u>

The Court concludes that Plaintiff has not demonstrated any genuine issues of material fact precluding summary judgment in favor of Defendant on his ADA discrimination claim.

For the purpose of summary judgment, Defendant does not appear to dispute that Plaintiff has satisfied the first four elements of his *prima facie* case of disability discrimination. Specifically, Defendant does not appear to dispute that it is an employer subject to the ADA, that Plaintiff's anxiety was a disability within the meaning of the ADA, that Plaintiff was qualified to perform the essential functions of his job, and that he suffered an adverse employment action when he was terminated.

Although Defendant contends that Plaintiff fails to raise a genuine dispute of material fact on the question of whether his termination "took place under circumstances giving rise to an inference of discrimination" due to his anxiety, *Davis*, 804 F.3d at 235, the Court finds that Plaintiff has met his *prima facie* burden as to this issue. As noted with respect to Plaintiff's Title VII gender discrimination claim, evidence that an employer replaced a terminated employee with an individual outside the employee's protected class gives rise to an inference of discrimination. *Littlejohn*, 795 F.3d at 312–13. Here, Taylor testified that Plaintiff was replaced by Erica Lopez, a woman who did not disclose having a disability. Taylor Dep., ECF No. 45-7, at 42:18–20. By

27

pointing to that testimony, Plaintiff has satisfied his minimal burden to identify circumstances giving rise to an inference of discrimination. *See Maynard*, 2018 WL 1633709, at *5; *Monger v. Conn. Dep't of Transp.*, No. 3:17-CV-205 (JCH), 2019 WL 399908, at *10 (D. Conn. Jan. 31, 2019).

Defendant has likewise satisfied its burden to proffer a legitimate, nondiscriminatory reason for terminating Plaintiff, specifically, Pelikan's finding that it was plausible that Plaintiff forged Carter's signatures when opening the new accounts.

Proceeding to the final step of the *McDonnell Douglas* analysis, the Court concludes that Plaintiff has failed to raise a genuine dispute of material fact demonstrating that Defendant's proffered reason was merely a pretext for disability discrimination.

To begin, as explained above with respect to Plaintiff's Title VII gender discrimination claim, Plaintiff does not identify evidence sufficient for a reasonable jury to find that Pelikan's finding of forgery was false, unworthy of belief, or implausible. Although Plaintiff represents that Pelikan's finding of forgery was false, his conclusory testimony on that point does not suffice to show that her finding was so wrong or so unworthy of belief that Defendant could not have believed it in good faith.

Moreover, Plaintiff has identified virtually no evidence, other than the fact that he was replaced by a person without a disability, suggesting that his disability was a but-for cause of Defendant's decision to terminate him. As noted above, the fact that Plaintiff was replaced by a person who did not have a disability is probative of discriminatory animus on the part of Taylor or Defendant generally. While such evidence is enough for Plaintiff to satisfy his initial *de minimis* burden to prove his *prima facie* case, however, it is not enough, standing alone, to permit a reasonable jury to find that Defendant's decision to terminate him would not have occurred but for

his disability.  Nor is the fact that Taylor and Defendant's Human Resources employees knew about Plaintiff's anxiety, Pl.'s Dep., ECF No. 41-3 at 105:5–10, sufficient to demonstrate discriminatory intent.  *Yetman v. Cap. Dist. Transp. Auth.*, 669 F. App'x 594, 595 (2d Cir. 2016) (summary order); *accord Phalon v. Avantor Inc.*, No. 3:19-CV-852 (JCH), 2021 WL 4477404, at *10 (D. Conn. Sept. 30, 2021).  Finally, Plaintiff concedes that no one employed by Defendant, including Taylor, ever made any negative comment about his anxiety.  Pl.'s Dep., ECF No. 45-4, at 193:15–19.

In sum, although Plaintiff has demonstrated a *prima facie* case of disability discrimination, he has not demonstrated that Defendant's proffered reason for terminating him was pretextual, nor has he otherwise presented sufficient evidence for a reasonable jury to find that his disability was a but-for cause of Defendant's decision to terminate him.  Thus, Defendant is entitled to summary judgment as to Count Five, Plaintiff's disability discrimination claim.

## V.   FAMILY AND MEDICAL LEAVE ACT RETALIATION (COUNT THREE)

The FMLA provides "broad protections to employees who need to take time away from work to deal with serious health conditions of the employee or [his] family."  *Woods v. START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 165–66 (2d Cir. 2017).  Specifically, under the FMLA, an eligible employee is entitled to take up to twelve weeks of unpaid leave per year due to the birth of a child, among other reasons, and the employee is entitled to reinstatement at the end of the leave.  29 U.S.C. §§ 2612(a)(1)(A), 2614(a).  It is unlawful for any employer to either "interfere with" the employee's exercise of his FMLA rights or retaliate against an employee who exercises their FMLA rights or opposes any practice made unlawful by the FMLA.  *Id.* § 2615. Thus, the FMLA authorizes two distinct claims:  (1) a claim of interference, when the defendant has impeded the plaintiff's exercise of his FMLA rights, and (2) a claim of retaliation, when the

plaintiff exercised his FMLA rights or opposed perceived unlawful conduct and then was subjected to an adverse employment action. *Woods*, 864 F.3d at 166.  As Plaintiff has abandoned his FLMA interference claim, the Court considers only his FMLA retaliation claim.

    A.  Legal Standard

Under the *McDonnell Douglas* framework, a plaintiff must establish a *prima facie* case of retaliation in violation of the FMLA by showing that (1) he "exercised rights protected under the FMLA"; (2) he "was qualified for his position"; (3) he "suffered an adverse employment action"; and (4) "the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Graziadio*, 817 F.3d at 429.  If the plaintiff establishes a *prima facie* case, and if the defendant then proffers a legitimate, non-retaliatory reason for the adverse employment action, the burden shifts back to the plaintiff to show that the proffered reason was pretextual. *Greenberg v. State Univ. Hosp. – Downstate Med. Ctr.*, 838 F. App'x 603, 606 (2d Cir. 2020) (summary order).  The plaintiff's ultimate burden is to show that retaliation was a motivating factor for the adverse employment action.  *Id.* (citing *Graziadio*, 817 F.3d at 429, and *Woods*, 864 F.3d at 168–69); *see also Woods*, 864 F.3d at 166.

    B.  Discussion

The Court holds that Plaintiff has not demonstrated a genuine issue of material fact as to his FMLA retaliation claim that would allow him to survive summary judgment.

Defendant does not appear to dispute that Plaintiff has satisfied the second and third elements of his *prima facie* case of FMLA retaliation:  that Plaintiff was qualified for his position or that he suffered an adverse employment action when he was terminated.  Defendant contends, however, that Plaintiff did not exercise his rights under the FMLA and that there is no evidence of retaliatory intent.

With respect to the first element, "[i]n order to exercise rights under the FMLA, one must request FMLA leave due to a qualifying" reason. *Dighello v. Thurston Foods, Inc.*, 307 F. Supp. 3d 5, 14 (D. Conn. 2018). Relevant here, regulations promulgated by the Department of Labor ("DOL") implementing the FMLA require an employee requesting an FMLA leave for a foreseeable reason, such as the anticipated birth of a child, to provide their employer with notice at least thirty days in advance of the start of the leave. 29 C.F.R. § 825.302(a). Absent an employer's policy regarding FMLA leave, the employee's notice need only be "sufficient to make the employer aware that the employee needs FMLA-qualifying leave," and the notice need not even mention the FMLA. *Id.* § 825.302(c). If an employer has a policy requiring the employee to comply with "usual and customary notice and procedural requirements for requesting leave," however, then the employee must comply with those requirements "absent unusual circumstances," and failure to comply with the requirements may justify delay or denial of FMLA leave. *Id.* § 825.302(d). *See also Millea v. Metro-N. R.R. Co.*, 658 F.3d 154, 161 (2d Cir. 2011).

Here, as an initial matter, Defendant's FMLA Policy required Plaintiff to contact The Hartford, Defendant's Leave Administrator, at least thirty days prior to the anticipated start of his leave. ECF No. 41-8 at 23; DiCicco Dep., ECF No. 41-5, at 21:24–22:1. Nothing in the record suggests that Plaintiff ever contacted The Hartford about his request to take paternity leave. Indeed, Plaintiff testified that he did not look at Defendant's FMLA Policy or its requirements and that he did not actually request to take FMLA leave. Pl.'s Dep., ECF No. 41-3, at 154:21–155:8. Although Plaintiff told Taylor about his wife's pregnancy and communicated by email with Gray about the details of his anticipated paternity leave, neither of those communications satisfied the requirements of Defendant's FMLA Policy, and Plaintiff has not attempted to argue that any

unusual circumstances motivated his deviation from the FMLA Policy's requirements.[9]  Because no reasonable jury could find that Plaintiff satisfied the notice requirement of Defendant's FMLA Policy, similarly no reasonable jury could find that Plaintiff exercised his rights under the FMLA for the purpose of his FMLA retaliation claim.

Even assuming Plaintiff exercised his rights under the FMLA, however, he could not prevail on his FMLA retaliation claim because he fails to show that his termination occurred under circumstances giving rise to an inference of retaliatory intent.  Plaintiff relies solely on temporal proximity to establish the causation element of his *prima facie* case.  As noted above, very close temporal proximity between a protected activity and an adverse employment action can demonstrate a causal connection sufficient to give rise to an inference of retaliation.  *Clark Cnty. Sch. Dist.*, 532 U.S. at 273; *Dollack*, 2021 WL 6339060, at *9.  Here, Plaintiff first informed Taylor of his need for parental leave in July of 2019, approximately five months before his termination in December of that year.  Under the circumstances present here, that time period is not so close as to give rise to an inference of retaliation standing alone, particularly because of the intervening accusation of forgery and investigation of misconduct.  *See Joseph*, 2010 WL 4513298, at *18.

Even if Plaintiff has met his *prima facie* burden, however, Defendant has proffered a legitimate, non-retaliatory reason for his termination, and Plaintiff has not proffered sufficient

---

[9] Plaintiff appears to argue that he put Defendant on "inquiry notice" as to his need for FMLA leave by informing Taylor and Gray of his need for paternity leave.  Pl.'s Opp. to Mot. for Summ. J. at 15.  As noted above, the FMLA generally does not require the employee to "expressly assert rights under the FMLA or even mention the FMLA."  29 C.F.R. § 825.302(c).  Accordingly, "on the basis of a request and some preliminary information an employer may be put on inquiry notice," in satisfaction of the employee's notice requirement for the purpose of an FMLA claim. *Jennings v. Parade Pub.*, No. 01 Civ. 8590 (TPG), 2003 WL 22241511, at *3 (S.D.N.Y. Sept. 30, 2003) (citing *Barnett v. Revere Smelting & Refining Corp.*, 67 F. Supp. 2d 378, 385 (S.D.N.Y. 1999)); *see also Dighello*, 307 F. Supp. 3d at 16 (noting that the employer's duties under the FMLA are triggered by the employee's provision of sufficient notice that they are in need of FMLA leave).  But Plaintiff has not explained why putting Defendant on inquiry notice here satisfies the notice requirement for an FMLA claim in light of the regulation permitting Defendant to require specific notice procedures, § 825.302(d), nor has he attempted to argue that Defendant's specific notice requirements somehow violate the FMLA.  Thus, the Court concludes that Plaintiff's inquiry notice does not satisfy the notice requirement of his FMLA retaliation claim as a matter of law.

evidence of any causal connection between his request for parental leave and his termination to withstand summary judgment. Although Plaintiff testified that Taylor's "tone and demeanor" toward him "changed dramatically" after Plaintiff informed Taylor of the anticipated birth of his child, Pl.'s Dep., ECF No. 41-3, at 53:17–22, Plaintiff fails to link Taylor's alleged change in tone and demeanor to any retaliatory intent on the part of Taylor—particularly in light of the intervening ethics investigation, which, notably, was not initiated by Taylor. Plaintiff also recognized that Taylor's reaction to the news that Plaintiff's wife was pregnant was to say, "ok, that's great." *Id.* at 54:18–23. Moreover, Plaintiff admitted that no one employed by Defendant, including Taylor, made any negative comment about Plaintiff taking leave for the birth of his child. Pl.'s L.R. 56(a)2 St. ¶¶ 21–22. While direct evidence such as a negative comment is not required, Plaintiff has not provided even sufficient circumstantial evidence to create a genuine issue of material fact that his alleged exercise of FMLA rights motivated his termination. *See Blodgett v. 22 S. St. Operations, LLC*, 828 F. App'x 1, 5 (2d Cir. 2020) (summary order) (at the third step of the *McDonnell Douglas* framework, noting that the temporal connection between the plaintiff's request for FMLA leave and her termination was "tenuous" in light of the defendant's disciplinary action against her); *Greenberg*, 838 F. App'x at 606–07 (at the third step of the *McDonnell Douglas* framework, noting that the plaintiff failed to show that his request for FMLA leave was a motivating factor in his termination in light of his flagrant misconduct).

In sum, the Court concludes that Plaintiff has not shown that he exercised rights protected by the FMLA and, even if he did, he has not demonstrated a causal connection between any such activity and his termination. Thus, even viewing the evidence in the light most favorable to Plaintiff, his FMLA retaliation claim cannot survive. Defendant is therefore entitled to summary judgment as to Count Three, Plaintiff's FMLA retaliation claim.

## VI.     CONCLUSION

For the reasons described above, Defendant's motion for summary judgment is GRANTED.  The Clerk is directed to enter judgment for Defendant on all counts and close this case.

**SO ORDERED** at Hartford, Connecticut, this 5th day of June, 2023.

 */s/ Sarala V. Nagala*
SARALA V. NAGALA
UNITED STATES DISTRICT JUDGE